**STATE OF NORTH CAROLINA**
**NEW HANOVER COUNTY**
**JUDICIAL DISTRICT 6**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**

| | |
|---|---|
| HOWARD PENNINGER, MALISHA ASHCRAFT, CHARLES DUNSMORE, ANITA HARTSELL, JACQUELINE LAJOIE, JAMES MOOREHEAD, JERRY PETERS, LYNN PETERSEN, BRENDA PILKINTON, KEVIN PONNETT, JOHN POWELL, GREGORY PRENTICE, JOSHUA PRIEST, SR., LORI ROBBINS, TAHNEE RODRIGUEZ OYOLA, ANNIE SEARCY, ROBERT SHANNON, JONATHAN SHEPPARD, PHILLIP SMITH, JR., WILLIE SMITH, JUDY SNIDER, JAMES STANLEY, ADRAIN TAYLOR, MYRON TRIPLETT, PATSY TUCKER, SARAH VANSICKLE, HAROLD VASSAR, JOSE VERA, JAMES WALKER, GLENDA WELCH, ASHLEY WHEELER, DUANE WHITE, SHANE WILLARD, COLLEEN WILLIAMS, ERIC WILLIAMS, HELEN WILLIAMS, MICHAEL WILLIAMS, MICHELLE WILLIAMS, TERRY WILLIAMS, PAUL WOODIE, JEFFREY WOODS, CAROLYN WRIGHT, AND OSWALDO ZARABIA, <br><br>        Plaintiffs, <br>   v. <br><br> 3M COMPANY (f/k/a Minnesota Mining and Manufacturing Co.); <br> AGC CHEMICAL AMERICAS, INC.; <br> AGC, INC. (f/k/a Asahi Glass Co., Ltd.); <br> ARCHROMA U.S., INC.; <br> ARKEMA, INC.; <br> BASF CORPORATION; <br> BUCKEYE FIRE EQUIPMENT COMPANY; <br> CHEMDESIGN PRODUCTS, INC.; <br> CHEMGUARD, INC.; <br> CLARIANT CORPORATION; <br> CORTEVA, INC.; | **CASE NO.** <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

| JOHN DOE DEFENDANTS 1-49; DUPONT DE NEMOURS, INC.; DYNAX CORPORATION; E. I. DUPONT DE NEMOURS AND COMPANY; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; AND TYCO FIRE PRODUCTS LP, | |
|---|---|
| Defendants. | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiffs, Howard Penninger, Malisha Ashcraft, Charles Dunsmore, Anita Hartsell, Jacqueline Lajoie, James Moorehead, Jerry Peters, Lynn Petersen, Brenda Pilkinton, Kevin Ponnett, John Powell, Gregory Prentice, Joshua Priest, Sr., Lori Robbins, Tahnee Rodriguez Oyola, Annie Searcy, Robert Shannon, Jonathan Sheppard, Phillip Smith, Jr., Willie Smith, Judy Snider, James Stanley, Adrain Taylor, Myron Triplett, Patsy Tucker, Sarah VanSickle, Harold Vassar, Jose Vera, James Walker, Glenda Welch, Ashley Wheeler, Duane White, Shane Willard, Colleen Williams, Eric Williams, Helen Williams, Michael Williams, Michelle Williams, Terry Williams, Paul Woodie, Jeffrey Woods, Carolyn Wright, and Oswaldo Zarabia, by and through undersigned counsel, bring this action against Defendants 3M Company (f/k/a Minnesota Mining and Manufacturing, Co.), AGC Chemical Americas, Inc., AGC, Inc. (f/k/a Asahi Glass Co., Ltd.), Archroma U.S., Inc., Arkema Inc., BASF Corporation, Buckeye Fire Equipment Company, Chemdesign Products, Inc., Chemguard, Inc., Clariant Corporation, Corteva, Inc., DuPont De Nemours, Inc., Dynax Corporation, E. I. Du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, and Tyco Fire Products, LP (individually and as successor-in-interest to The Ansul Company). Plaintiffs hereby allege, upon information and belief, as follows:

### I.    SUMMARY OF THE CASE

1.    Plaintiffs bring this action against Defendants who manufactured aqueous film-

forming foam ("AFFF"), exposure to which resulted in Plaintiffs' serious personal injuries. The AFFF manufactured by Defendants contained per- and polyfluoroalkyl substances ("PFAS") including, but not limited to, perfluorooctanoic acid ("PFOA") and/or perfluorooctane sulfonic acid ("PFOS").

2.     PFOS and PFOA are fluorosurfactants that repel oil, grease, and water. PFOS, PFOA, and/or their chemical precursors, are or were components of AFFF products, which are firefighting suppressant agents used in training and firefighting activities for fighting Class B fires. Class B fires include fires involving hydrocarbon fuels such as petroleum or other flammable liquids.

3.     PFOS and PFOA are mobile, persist indefinitely in the environment, bioaccumulate in individual organisms and humans, and biomagnify up the food chain. PFOS and PFOA are also associated with multiple and significant adverse health effects in humans, including but not limited to kidney cancer, testicular cancer, high cholesterol, thyroid disease, ulcerative colitis, and pregnancy-induced hypertension.

4.     At various times from the 1960s through today, Defendants designed, manufactured, marketed, distributed, and/or sold AFFF products containing PFOS, PFOA, and/or their chemical precursors, and/or designed, manufactured, marketed, distributed, and/or sold the fluorosurfactants and/or perfluourinated chemicals contained in AFFF.

5.     This Complaint refers to AFFF, PFOA, PFOS, PFAS compounds, and fluorosurfactants collectively as "Fluorosurfactant Products."

6.     Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the knowledge that firefighters would be exposed to these toxic compounds during fire protection, training, and response activities even when the AFFF was used as directed and intended by the manufacturer.

3

7.      Defendants manufactured, marketed and/or sold Fluorosurfactant Products with the knowledge that PFAS are toxic, persist indefinitely, and would be routinely released into the environment, including the drinking water supply, even when the AFFF was used as directed and intended by Defendants.

8.      Due to the widespread PFAS contamination caused by Defendants' Fluorosurfectant Products, including the contamination of Plaintiffs' drinking water supplies, Plaintiffs have suffered serious personal injuries set forth in detail below. Plaintiffs' injuries are a direct result of their exposure to the PFAS contamination present in their drinking water supplies.

9.      Plaintiffs, as residents and those who visited, worked, or resided in the contaminated areas, have been unknowingly exposed for many years to dangerous PFAS levels.

10.     Plaintiffs' unwitting exposure to PFAS in their water supply as a result of Defendants' conduct set forth below is the direct and proximate cause of Plaintiffs' injuries.

11.     Plaintiffs file this lawsuit to recover compensatory and all other damages, including but not limited to past and future (1) expenses for care, treatment and hospitalization incident to their injuries;  (2) compensation for physical pain and suffering;  (3) loss of income, wages, or earning capacity; (4) compensation for mental or emotional pain and anguish; (5) physical impairment; (6) loss of companionship and society;  (7) inconvenience; (8) loss of enjoyment of life; and (9) exemplary damages.

## II.      PARTIES

### A. Plaintiffs

12.     Plaintiff Howard Penninger is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 1978 to 2025, Plaintiff Howard Penninger was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Jackson, Columbia, South Carolina; Aberdeen Proving Ground, Aberdeen, Maryland; Army National Guard,

4

Burtner, North Carolina; North Carolina National Guard, Morrisville, North Carolina; Raleigh, North Carolina; and Wilmington, North Carolina.

13. On or about 2008, Plaintiff Howard Penninger was diagnosed with testicular cancer in Wilmington, North Carolina and subsequently underwent a total left orchiectomy and chemotherapy treatment.

14. Plaintiff Malisha Ashcraft is a citizen and resident of Lancaster, Kentucky. From approximately 2001 to 2025, Plaintiff Malisha Ashcraft was regularly exposed to PFAS through drinking water at residences and workplaces in Statesville, North Carolina; Mooresville, North Carolina; and Lancaster, Kentucky.

15. On or about October 2017, Plaintiff Malisha Ashcraft was diagnosed with kidney cancer in Danville, Kentucky and subsequently underwent a radical right nephrectomy.

16. Plaintiff Charles Dunsmore is a citizen and resident of Kyles Ford, Tennessee. From approximately 1998 to 2008, Plaintiff Charles Dunsmore was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Bragg, North Carolina; Fort Campbell, Kentucky; Fort Jackson, South Carolina; and Camp Mackall, North Carolina.

17. On or about April 2023, Plaintiff Charles Dunsmore was diagnosed with kidney cancer in Kingsport, Tennessee and subsequently underwent a radical left nephrectomy.

18. Plaintiff Anita Hartsell is a citizen and resident of Concord, North Carolina. From approximately 1984 to 2025, Plaintiff Anita Hartsell was regularly exposed to PFAS through drinking water at residences in Concord, North Carolina.

19. On or about December 2023, Plaintiff Anita Hartsell was diagnosed with kidney cancer in Charlotte, North Carolina and subsequently underwent related treatment.

20. Plaintiff Jacqueline Lajoie is a citizen and resident of Augusta, Maine. From approximately 1972 to 2011, Plaintiff Jacqueline Lajoie was regularly exposed to PFAS through

drinking water at residences, schools, and workplaces in Augusta, Maine; Gardiner, Maine; Randolph, Maine; and Leland, North Carolina.

21.     On or about July 2024, Plaintiff Jacqueline Lajoie was diagnosed with clear cell renal carcinoma in Augusta, Maine and subsequently underwent related treatment.

22.     Plaintiff James Moorehead is a citizen and resident of Providence, Rhode Island. From approximately 1980 to 2011, Plaintiff James Moorehead was regularly exposed to PFAS through drinking water at residences in Warwick, Rhode Island; Raleigh, North Carolina; Saint Paul, Minnesota; Minneapolis, Minnesota; St. Louis Park, Minnesota; and Harts Location, New Hampshire.

23.     On or about 2009, Plaintiff James Moorehead was diagnosed with testicular cancer in St. Louis Park, Minnesota and subsequently underwent a right orchiectomy and chemotherapy treatments.

24.     Plaintiff Jerry Peters is a citizen and resident of Lexington, North Carolina. From approximately 1975 to 2025, Plaintiff Jerry Peters was regularly exposed to PFAS through drinking water at residences in Lexington, North Carolina; Charlotte, North Carolina; and Mooresville, North Carolina.

25.     On or about February 2025, Plaintiff Jerry Peters was diagnosed with kidney cancer and underwent related treatment.

26.     Plaintiff Lynn Petersen is a citizen and resident of Eatonton, Georgia. From approximately 1970 to 2023, Plaintiff Lynn Petersen was regularly exposed to PFAS through drinking water at residences in Charlotte, North Carolina and Myrtle Beach, South Carolina.

27.     On or about 2022, Plaintiff Lynn Petersen was diagnosed with clear cell renal carcinoma in Watkinsville, Georgia and subsequently underwent a partial left nephrectomy.

28.     Plaintiff Brenda Pilkinton is a citizen and resident of Hildebran, North Carolina. From approximately 1970 to 1996, Plaintiff Brenda Pilkinton was regularly exposed to PFAS through drinking water at residences and schools in Lenoir, North Carolina and Conover, North Carolina.

29.     On or about 2000, Plaintiff Brenda Pilkinton was diagnosed with thyroid disease in Hildebran, North Carolina. On or about 2014, Plaintiff Brenda Pilkinton was diagnosed with kidney cancer in Hickory, North Carolina and subsequently underwent a radical right nephrectomy.

30.     Plaintiff Kevin Ponnett is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 1997 to 2025, Plaintiff Kevin Ponnett was regularly exposed to PFAS through drinking water at residences and workplaces in Wilmington, North Carolina and Bryn Mawr, Pennsylvania.

31.     On or about July 2005, Plaintiff Kevin Ponnett was diagnosed with testicular cancer in Wilmington, North Carolina and subsequently underwent a total left orchiectomy and radiation treatment.

32.     Plaintiff John Powell is a citizen and resident of Raleigh, North Carolina. From approximately 1999 to 2025, Plaintiff John Powell was regularly exposed to PFAS through drinking water at residences and workplaces in Raleigh, North Carolina; Bellefonte, Pennsylvania; and Cary, North Carolina.

33.     On or about September 2013, Plaintiff John Powell was diagnosed with kidney cancer in Cary, North Carolina and subsequently underwent a radical right nephrectomy.

34.     Plaintiff Gregory Prentice is a citizen and resident of Henderson, North Carolina. From approximately 1970 to 2025, Plaintiff Gregory Prentice was regularly exposed to PFAS through drinking water at residences and schools in Rochester, New York; Lima, New York; and Henderson, North Carolina.

35.     On or about 2014, Plaintiff Gregory Prentice was diagnosed with testicular cancer in Raleigh, North Carolina and subsequently underwent a total left orchiectomy and chemotherapy treatment.

36.     Plaintiff Joshua Priest, Sr. is a citizen and resident of Winston-Salem, North Carolina. From approximately 1999 to 2025, Plaintiff Joshua Priest, Sr. was regularly exposed to PFAS through drinking water at residences and workplaces in the Myrtle Beach Air Force Base, Myrtle Beach, South Carolina; Altus Air Force Base, Altus, Oklahoma; Pope Army Airfield, Fayetteville, North Carolina; Flowood, Mississippi; and Winston-Salem, North Carolina.

37.     On or about October 2023, Plaintiff Joshua Priest, Sr. was diagnosed with kidney cancer in Winston-Salem, North Carolina and subsequently underwent a partial bilateral nephrectomy.

38.     Plaintiff Lori Robbins is a citizen and resident of Wilson, North Carolina. From approximately 1983 to 2025, Plaintiff Lori Robbins was regularly exposed to PFAS through drinking water at residences and workplaces in Wilson, North Carolina.

39.     On or about November 2024, Plaintiff Lori Robbins was diagnosed with kidney cancer in Wilson, North Carolina and subsequently underwent a radical left nephrectomy.

40.     Plaintiff Tahnee Rodriguez Oyola is a citizen and resident of Durham, North Carolina. From approximately 2000 to 2025, Plaintiff Tahnee Rodriguez Oyola was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Vancouver, Vancouver, Washington; Fort Sam Houston, San Antonio, Texas; U.S. Army Basic Combat Training Museum, Columbia, South Carolina; Federal Way, Washington; Des Moines, Washington; Cary, North Carolina; and Durham, North Carolina.

41.     On or about 2015, Plaintiff Tahnee Rodriguez Oyola was diagnosed with thyroid disease in Cary, North Carolina. On or about August 2022, Plaintiff Tahnee Rodriguez Oyola was

diagnosed with kidney cancer in Apex, North Carolina and subsequently underwent a radical right nephrectomy.

42. Plaintiff Annie Searcy is a citizen and resident of Winston-Salem, North Carolina. From approximately 1988 to 2011, Plaintiff Annie Searcy was regularly exposed to PFAS at residences in Winston-Salem, North Carolina.

43. On or about 2007, Plaintiff Annie Searcy was diagnosed with kidney cancer in Winston-Salem, North Carolina and subsequently underwent a radical right nephrectomy.

44. Plaintiff Robert Shannon is a citizen and resident of Tarawa Terrace, North Carolina. From approximately 2005 to 2019, Plaintiff Robert Shannon was regularly exposed to PFAS through drinking water at residences and workplaces in the Marine Corps Recruit Depot, San Diego, California; Marine Corps Base Camp Pendleton, Oceanside, California; Marine Corps Base Camp Lejeune, Jacksonville, North Carolina; Joint Expeditionary Base Little Creek-Fort Story, Virginia Beach, Virginia; and Jacksonville, North Carolina.

45. On or about 2018, Plaintiff Robert Shannon was diagnosed with testicular cancer in Portsmouth, Virginia and subsequently underwent a total right orchiectomy and chemotherapy treatment.

46. Plaintiff Jonathan Sheppard is a citizen and resident of Charlotte, North Carolina. From 1985 to 2025, Plaintiff Jonathan Sheppard was regularly exposed to PFAS through drinking water at residences and workplaces in the Naval Air Station North Island, San Diego, California; Great Lakes Naval Station, North Chicago, Illinois; Naval Air Technical Training Center, Pensacola, Florida; Woodbridge, Virginia; Charlotte, North Carolina; and Monroe, North Carolina.

47. On or about February 2023, Plaintiff Jonathan Sheppard was diagnosed with clear cell renal carcinoma in Huntersville, North Carolina and subsequently underwent a partial left

nephrectomy. On or about 2023, Plaintiff Jonathan Sheppard was diagnosed with ulcerative colitis in Huntersville, North Carolina.

48.     Plaintiff Phillip Smith, Jr. is a citizen and resident of Lumberton, North Carolina. From approximately 1992 to 2024, Plaintiff Phillip Smith, Jr. was regularly exposed to PFAS through drinking water at residences and schools in Fort Bragg, Fayetteville, North Carolina; Fayetteville, North Carolina; and Lumberton, North Carolina.

49.     On or about December 20, 2018, Plaintiff Phillip Smith, Jr. was diagnosed with kidney cancer in Durham, North Carolina and subsequently underwent a radical left nephrectomy, chemotherapy, and radiation treatment. On or about 2020, Plaintiff Phillip Smith, Jr. was diagnosed with thyroid disease in Raleigh, North Carolina.

50.     Plaintiff Willie Smith is a citizen and resident of Cameron, North Carolina. From approximately 1969 to 2021, Plaintiff Willie Smith was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Bragg, Fayetteville, North Carolina and Cameron, North Carolina.

51.     On or about 2024, Plaintiff Willie Smith was diagnosed with kidney cancer in Pinehurst, North Carolina and subsequently underwent chemotherapy treatment.

52.     Plaintiff Judy Snider is a citizen and resident of Eden, North Carolina. From approximately 1970 to 2025, Plaintiff Judy Snider was regularly exposed to PFAS through drinking water at residences in Greensboro, North Carolina; Eden, North Carolina; and Wilmington, North Carolina.

53.     On or about December 2023, Plaintiff Judy Snider was diagnosed with kidney cancer in Reidsville, North Carolina and subsequently underwent a partial left nephrectomy.

54.     Plaintiff James Stanley is a citizen and resident of King, North Carolina. From approximately 1979 to 2025, Plaintiff James Stanley was regularly exposed to PFAS through

drinking water at his residence and place of employment in Klernersville, North Carolina and King, North Carolina.

55.     On or about September 2006, Plaintiff James Stanley was diagnosed with clear cell renal carcinoma in Winston-Salem, North Carolina and subsequently underwent a partial left nephrectomy.

56.     Plaintiff Adrain Taylor is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 1974 to 2025, Plaintiff Adrain Taylor was regularly exposed to PFAS through drinking water at residences, schools, and workplaces in Norfolk Naval Base, Norfolk, Virginia; Wilmington, North Carolina; and Winston-Salem, North Carolina.

57.     On or about March 2019, Plaintiff Adrain Taylor was diagnosed with kidney cancer in Winston-Salem, North Carolina and subsequently underwent a radical right nephrectomy.

58.     Plaintiff Myron Triplett is a citizen and resident of Holly Springs, North Carolina. From approximately 1982 to 2025, Plaintiff Myron Triplett was regularly exposed to PFAS through drinking water at residences in Lenoir, North Carolina and Holly Springs, North Carolina.

59.     On or about 2020, Plaintiff Myron Triplett was diagnosed with kidney cancer in Cary, North Carolina and subsequently underwent a partial left nephrectomy.

60.     Plaintiff Patsy Tucker is a citizen and resident of Mayodan, North Carolina. From approximately 1986 to 2013, Plaintiff Patsy Tucker was regularly exposed to PFAS through drinking water at residences in Eden, North Carolina and Kernersville, North Carolina.

61.     On or about March 2017, Plaintiff Patsy Tucker was diagnosed with kidney cancer in Greensboro, North Carolina and subsequently underwent a partial right nephrectomy.

62.     Plaintiff Sarah VanSickle is a citizen and resident of Hendersonville, North Carolina. From approximately 1989 to 2024, Plaintiff Sarah VanSickle was regularly exposed to PFAS through

drinking water at residences and workplaces in Charlotte, North Carolina; Delray Beach, Florida; Royal Palm Beach, Florida; and Hendersonville, North Carolina.

63. On or about April 2023, Plaintiff Sarah VanSickle was diagnosed with clear cell renal carcinoma in Hendersonville, North Carolina and subsequently underwent a radical left nephrectomy and adrenalectomy.

64. Plaintiff Harold Vassar is a citizen and resident of Eden, North Carolina. From approximately 1978 to 2025, Plaintiff Harold Vassar was regularly exposed to PFAS through drinking water at residences and workplaces in Eden, North Carolina.

65. On or about September 2, 2015, Plaintiff Harold Vassar was diagnosed with kidney cancer in Greensboro, North Carolina and subsequently underwent a partial left nephrectomy.

66. Plaintiff Jose Vera is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 1984 to 2025, Plaintiff Jose Vera was regularly exposed to PFAS through drinking water at residences in Woodside, New York; Elmhurst, New York; Whitestone, New York; Flushing, New York; Little River, South Carolina; New York, New York; Wilmington, North Carolina; and Myrtle Beach, South Carolina.

67. On or about September 2023, Plaintiff Jose Vera was diagnosed with kidney cancer in Wilmington, North Carolina and subsequently underwent a radical left nephrectomy.

68. Plaintiff James Walker is a citizen and resident of Shelby, North Carolina. From approximately 1980 to 2007, Plaintiff James Walker was regularly exposed to PFAS through drinking water at residences and schools in Lawndale, North Carolina; Bessemer City, North Carolina; Lenoir, North Carolina; Shelby, North Carolina; and Cherryville, North Carolina.

69. On or about September 2009, Plaintiff James Walker was diagnosed with testicular cancer in Hickory, North Carolina and subsequently underwent a total left orchiectomy and radiation treatments.

70.     Plaintiff Glenda Welch is a citizen and resident of Denton, North Carolina. From approximately 1996 to 2025, Plaintiff Glenda Welch was regularly exposed to PFAS through drinking water at residences in Lexington, North Carolina and Denton, North Carolina.

71.     On or about 2010, Plaintiff Glenda Welch was diagnosed with kidney cancer in Thomasville, North Carolina and subsequently underwent a radical right nephrectomy.

72.     Plaintiff Ashley Wheeler is a citizen and resident of Hillsborough, North Carolina. From approximately 1993 to 2025, Plaintiff Ashley Wheeler was regularly exposed to PFAS through drinking water at residences and workplaces in Chapel Hill, North Carolina; Hyde Park, New York; Durham, North Carolina; Poughkeepsie, New York; and Hillsborough, North Carolina.

73.     On or about March 2012, Plaintiff Ashley Wheeler was diagnosed with clear cell renal carcinoma in Durham, North Carolina and subsequently underwent a radical left nephrectomy. On or about 2023, Plaintiff Ashley Wheeler was diagnosed with thyroid disease in Durham, North Carolina.

74.     Plaintiff Duane White is a citizen and resident of Charlotte, North Carolina. From approximately 2000 to 2025, Plaintiff Duane White was regularly exposed to PFAS through drinking water at residences in Trenton, New Jersey; Hamlet, North Carolina; Greensboro, North Carolina; and Charlotte, North Carolina.

75.     On or about 2019, Plaintiff Duane White was diagnosed with kidney cancer in Chapel Hill, North Carolina and subsequently underwent a radical right nephrectomy, chemotherapy, and radiation treatment.

76.     Plaintiff Shane Willard is a citizen and resident of High Point, North Carolina. From approximately 1998 to 2025, Plaintiff Shane Willard was regularly exposed to PFAS through drinking water at residences and schools in Archdale, North Carolina; Trinity, North Carolina; Myrtle Beach, South Carolina; Conway, South Carolina; and High Point, North Carolina.

13

77.     On or about July 24, 2021, Plaintiff Shane Willard was diagnosed with testicular cancer in High Point, North Carolina and subsequently underwent a total left orchiectomy, tumor removal, and chemotherapy treatment.

78.     Plaintiff Colleen Williams is a citizen and resident of Holly Ridge, North Carolina. From approximately 1970 to 2025, Plaintiff Colleen Williams was regularly exposed to PFAS through drinking water at residences in Philadelphia, Pennsylvania; Hampstead, North Carolina; and Holly Ridge, North Carolina.

79.     On or about 2015, Plaintiff Colleen Williams was diagnosed with kidney cancer in Chapel Hill, North Carolina and subsequently underwent a partial right nephrectomy.

80.     Plaintiff Eric Williams is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 2001 to 2025, Plaintiff Eric Williams was regularly exposed to PFAS through drinking water at residences and workplaces in Burgaw, North Carolina and Wilmington, North Carolina.

81.     On or about 2014, Plaintiff Eric Williams was diagnosed with kidney cancer in Wilmington, North Carolina and subsequently underwent a partial left nephrectomy.

82.     Plaintiff Helen Williams is a citizen and resident of Raleigh, North Carolina. From approximately 1970 to 2017, Plaintiff Helen Williams was regularly exposed to PFAS through drinking water at residences in Newport News, Virginia; Hampton, Virginia; Raleigh, North Carolina; and Griffin, Georgia.

83.     On or about 1996, Plaintiff Helen Williams was diagnosed with thyroid disease in Jonesboro, Georgia. On or about 2023, Plaintiff Helen Williams was diagnosed with clear cell renal carcinoma in Raleigh, North Carolina and subsequently underwent a cryoablation.

84.     Plaintiff Michael Williams is a citizen and resident of Mocksville, North Carolina. From approximately 2001 to 2005, Plaintiff Michael Williams was regularly exposed to PFAS through drinking water at residences in Mocksville, North Carolina.

85.     On or about April 2015, Plaintiff Michael Williams was diagnosed with clear cell renal carcinoma in Winston-Salem, North Carolina and subsequently underwent a partial left nephrectomy. On or about 2018, Plaintiff Michael Williams was diagnosed with again diagnosed with clear cell renal carcinoma in Winston-Salem, North Carolina and subsequently underwent a partial right nephrectomy.

86.     Plaintiff Michelle Williams is a citizen and resident of Wade, North Carolina. From approximately 1967 to 2025, Plaintiff Michelle Williams was regularly exposed to PFAS through drinking water at residences and schools in Fort Bragg, Fayetteville, North Carolina; Fayetteville, North Carolina; Hope Mills, North Carolina; and Wade, North Carolina.

87.     On or about July 2003, Plaintiff Michelle Williams was diagnosed with kidney cancer in Chapel Hill, North Carolina and subsequently underwent a partial left nephrectomy.

88.     Plaintiff Terry Williams is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 2010 to 2025, Plaintiff Terry Williams was regularly exposed to PFAS through drinking water at residences in Wilmington, North Carolina and Winnabow, North Carolina.

89.     On or about December 2023, Plaintiff Terry Williams was diagnosed with kidney cancer in Wilmington, North Carolina and subsequently underwent a radical right nephrectomy.

90.     Plaintiff Zachary Williams is a citizen and resident of Fayetteville, North Carolina. From approximately 1996 to 2025, Plaintiff Zachary Williams was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Jackson, Columbia, South Carolina;

Goodfellow Air Force Base, San Angelo, Texas; Fort Sam Houston, San Antonio, Texas; and Fayetteville, North Carolina.

91.    On or about May 2016, Plaintiff Zachary Williams was diagnosed with testicular cancer in Fayetteville, North Carolina and subsequently underwent a total left orchiectomy and chemotherapy treatment.

92.    Plaintiff Paul Woodie is a citizen and resident of Milaca, Minnesota. From approximately 1986 to 2003, Plaintiff Paul Woodie was regularly exposed to PFAS through drinking water at residences in Jackson, Wyoming; Wheat Ridge, Colorado; Lakewood, Colorado; Ogden, Utah; West Jefferson, North Carolina; Denver, North Carolina; and Vale, North Carolina.

93.    On or about December 2012, Plaintiff Paul Woodie was diagnosed with kidney cancer in Afton, Wyoming and subsequently underwent a partial left nephrectomy.

94.    Plaintiff Jeffrey Woods is a citizen and resident of Linden, North Carolina. From approximately 1970 to 2007, Plaintiff Jeffrey Woods was regularly exposed to PFAS through drinking water at residences and workplaces in Fort Belvoir, Virginia; Fort Bragg, Fayetteville, North Carolina; Baltimore, Maryland; London, Kentucky; Cambridge, Massachusetts; and Spring Lake, North Carolina.

95.    On or about 2019, Plaintiff Jeffrey Woods was diagnosed with kidney cancer in Chapel Hill, North Carolina and subsequently underwent a partial left nephrectomy.

96.    Plaintiff Carolyn Wright is a citizen and resident of Reidsville, North Carolina. From approximately 2009 to 2025, Plaintiff Carolyn Wright was regularly exposed to PFAS through drinking water at residences and schools in Unionville, Missouri; Reidsville, North Carolina; and Jamestown, North Carolina.

97.    On or about July 2023, Plaintiff Carolyn Wright was diagnosed with kidney cancer in Reidsville, North Carolina and subsequently underwent a radical right nephrectomy.

16

98.     Plaintiff Oswaldo Zarabia is a citizen and resident of Wilmington, North Carolina in New Hanover County. From approximately 1980 to 2025, Plaintiff Oswaldo Zarabia was regularly exposed to PFAS through drinking water at residences and workplaces in Joint Base Andrews, Maryland; Bethesda, Maryland; Germantown, Maryland; Raleigh, North Carolina; and Wilmington, North Carolina.

99.     On or about 2011, Plaintiff Oswaldo Zarabia was diagnosed with kidney cancer in Raleigh, North Carolina and subsequently underwent a radical left nephrectomy.

**B.  Defendants**

100.    Upon information and belief, the following Defendants designed, manufactured, formulated, marketed, promoted, distributed, and/or sold the Fluorosurfactant Products to which Plaintiffs were exposed.

101.    **3M:** Defendant 3M Company (f/k/a Minnesota Mining and Manufacturing Company) ("3M") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 3M Center, St. Paul, Minnesota 55144. At all times relevant, 3M manufactured, marketed, promoted, distributed, and/or sold AFFF containing PFOA and/or PFOS used to fight fires at numerous military bases, airports, and other locations throughout the country.

102.    3M is the only company that manufactured and/or sold AFFF containing PFOS.

103.    **AGC AMERICA:** Defendant AGC Chemical Americas, Inc. ("AGC America") is a Delaware corporation with its principal business office at 55 E. Uwchlan Avenue, Suite 201, Exton, Pennsylvania 19341. Upon information and belief, AGC America is a subsidiary of AGC, Inc., a Japanese corporation formerly known as Asahi Glass Company, Ltd.

104. **AGC:** Defendant AGC, Inc. f/k/a Asahi Glass Co., Ltd. ("AGC"), is a corporation organized under the laws of Japan and does business throughout the United States. AGC has its principal place of business at 1-5-1, Marunouchi, Chiyoda-ku, Tokyo 100-8405 Japan.

105. **ARCHROMA US:** Defendant Archroma U.S., Inc. ("Archroma US") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., #10, Charlotte, North Carolina 28217. Upon information and belief, Archroma U.S., Inc. is a subsidiary of Archroma Management, LLC, and supplied Fluorosurfactant Products for use in AFFF.

106. **ARKEMA:** Defendant Arkema, Inc. is a corporation organized and existing under the laws of the State of Pennsylvania, with its principal place of business at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema, Inc. is an operating subsidiary of Arkema France, S.A.

107. **BASF:** Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932. Upon information and belief, BASF acquired Ciba-Geigy Corporation and/or Ciba Specialty Chemicals.

108. **BUCKEYE:** Defendant Buckeye Fire Equipment Company ("Buckeye") is a foreign corporation organized and existing under the laws of the State of Ohio, with its principal place of business at 110 Kings Road, Mountain, North Carolina 28086. This Defendant manufactured and sold AFFF that contained PFOA.

109. **CHEMDESIGN:** Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business located at 2 Stanton Street, Marinette, Wisconsin 54143.

110. **CHEMGUARD:** Defendant Chemguard, Inc. ("Chemguard") is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. This Defendant manufactured and sold AFFF that contained PFOA.

18

111.     **CLARIANT:** Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

112.     **CORTEVA:** Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

113.     **DUPONT DE NEMOURS:** Defendant DuPont De Nemours, Inc. (f/k/a DowDuPont, Inc.) is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805. DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and DuPont.

114.     Upon information and belief, Corteva was originally formed in February 2018 as a wholly-owned subsidiary of DowDuPont, Inc. On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Corteva. In doing so, DowDuPont, Inc. distributed all issued and outstanding shares of Corteva common stock to DowDuPont, Inc. stockholders by way of a pro-rata dividend. Upon information and belief, following that distribution, Corteva became the direct parent of DuPont, and holds certain DowDuPont, Inc. assets and liabilities.

115.     Following the June 1, 2019 spin-off of Corteva and of another entity, Dow, Inc., DowDuPont, Inc. changed its name to DuPont De Nemours, Inc. ("New DuPont"). Upon information and belief, New DuPont retained assets in the specialty products business lines, as well as the balance of the financial assets and liabilities of DuPont not assumed by Corteva.

116.     **DYNAX:** Defendant Dynax Corporation ("Dynax") is a Delaware corporation with its principal place of business located at 103 Fairview Park Drive, Elmsford, New York 10523. Upon information and belief, this Defendant manufactured Fluorosurfactant Products for use in AFFF.

117.    **DUPONT:** Defendant E. I. Du Pont De Nemours and Company ("DuPont") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.

118.    **CHEMOURS:** Defendant The Chemours Company ("Chemours") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, Wilmington, Delaware 19899.

119.    In 2015, DuPont spun off its "Performance Chemicals" business to Chemours, along with certain environmental liabilities. Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries arising from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

120.    **CHEMOURS FC:** Defendant The Chemours Company FC LLC ("Chemours FC"), successor in interest to DuPont Chemical Solutions Enterprise, is a Delaware limited liability company that conducts business throughout the United States. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

121.    **TYCO:** Defendant Tyco Fire Products L.P. ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located at 1400 Pennbrook Parkway, Lansdale, Pennsylvania 19446.

122.    Tyco is an indirect subsidiary that is wholly owned by Johnson Controls International P.L.C., an Irish public limited company listed on the New York Stock Exchange

123.    Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco"). At all times relevant,

20

Tyco manufactured, marketed, promoted, distributed, and/or sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFAS.

124. Upon information and belief, Defendant John Does 1-49 were manufacturers and/or sellers of AFFF products. Although the identities of the John Doe Defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the Plaintiffs will move for leave of this Court to add those individuals' actual names to the Complaint as Defendants.

125. All of the foregoing Defendants, upon information and belief, have previously conducted and/or currently conduct their business throughout the United States. Moreover, some of the foregoing Defendants, if not all, have conducted and/or are currently conducting business in the State of Florida.

126. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates and divisions of the named Defendants.

127. The term "Defendants," without naming any specific one, refers to all Defendants named in this Complaint jointly and severally. When reference is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III.     JURISDICTION & VENUE

128. This Court has jurisdiction pursuant to N.C.G.S.A. § 7A-243 because the amount in controversy exceeds twenty-five thousand dollars ($25,000,00).

129. This Court has jurisdiction over Defendants because, based on information and belief, each is a corporation or other business that has sufficient minimum contacts in North Carolina, or

otherwise intentionally avails itself of the North Carolina market either through the distribution or sale of products containing PFAS in the State of North Carolina or by having a manufacturing, distribution or other facility located in North Carolina so as to render the exercise of jurisdiction over it by the North Carolina courts consistent with traditional notions of fair play and substantial justice.

130.    Venue is appropriate in this county pursuant to N.C.G.S.A. §§ 1-76-1-80 as facts giving rise to the Plaintiffs' causes of action arose in New Hanover County, many of the exposure sites at issue are in New Hanover County, and several Plaintiffs reside in this County.

## IV.    FACTUAL ALLEGATIONS

### A.  The PFAS Contaminants at Issue: PFOA and PFOS

131.    Both PFOA and PFOS fall within a class of chemical compounds known as perfluoroalkyl acids ("PFAAs"). PFAAs are then part of a larger chemical family recognized as per- and polyfluoroalkyl substances ("PFAS"). PFAA is composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, meanwhile the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature.

132.    PFAAs are sometimes described as long-chain and short-chain compounds, depending on the number of carbon atoms contained in the carbon chain. PFOA and PFOS are considered long-chain PFAAs because they each have eight carbon atoms in their chains.

133.    PFOA and PFOS are stable, man-made chemicals.  They are highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because these compounds are water soluble and do not readily adsorb to sediments or soil, they tend to stay in the water column and can be transported long distances.

134.    Both PFOA and PFOS are readily absorbed in animal and human tissues after oral exposure and accumulate in the serum, kidney, and liver.  They have been found globally in water,

soil and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[1]

135.    Moreover, PFOA and PFOS are persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[2]

136.    Notably, from the time these two compounds were first produced, information has emerged showing negative health effects caused by exposure to PFOA and PFOS. According to EPA, PFOA and PFOS are associated with high cholesterol, thyroid disorders, pregnancy-induced hypertension, preeclampsia, reproductive, developmental, and systemic effects, and cancers.[3]

137.    The EPA has warned that there is suggestive evidence of the carcinogenic potential for PFOA and PFOS in humans.[4]

138.    EPA continues to research the effects of PFAS.  In June 2022, after evaluating over 400 studies published since 2016 and applying human health risk assessment approaches, tools, and models EPA concluded that the new data indicates that the levels of PFOA and/or PFOS exposure at which negative outcomes could occur are much lower than previously understood when the agency issued its 2016 HAs for PFOA and PFOS (70 parts per trillion or ppt).  EPA therefore announced new Interim Updated Health Advisory levels for PFOA of 0.004 ppt and 0.02 ppt for PFOS.[5]

---

[1] EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS),* Document No. EPA 822-R-16-002 (May 2016), available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed March 11, 2025);  EPA, *Health Effects Support Document for Perfluorooctanoic Acid (PFOA)*, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfoa_hesd_final-plain.pdf (last accessed March 11, 2025).

[2] *See* notes 1, 2, *supra.  See also* EPA, Technical *Fact Sheet – Perflurooctane Sulfonate (PFOS) and Perfluorooctanoic Acid (PFOA),* available at  https://www.regulations.gov/document/EPA-HQ-TRI-2022-0270-0009 (last accessed March 11, 2025).

[3] *Id.*

[4] *See* EPA, *Health Effects Support Document for Perfluorooctane Sulfonate (PFOS)*, Document Number: 822 R-16-002, available at https://www.epa.gov/sites/default/files/2016-05/documents/pfos_hesd_final_508.pdf (last accessed March 11, 2025).

[5] EPA, *Technical Fact Sheet: Drinking Water Health Advisories for Four PFAS (PFOA, PFOS, GenX chemicals, and*

139. In April, 2024, EPA established legally enforceable levels, called Maximum Contaminant Levels (MCLs), for six PFAS in drinking water: PFOA, PFOS, PFHxS, PFNA, and HFPO-DA as contaminants with individual MCLs, and PFAS mixtures containing at least two or more of PFHxS, PFNA, HFPO-DA, and PFBS using a Hazard Index MCL to account for the combined and co-occurring levels of these PFAS in drinking water. EPA also finalized health-based, non-enforceable Maximum Contaminant Level Goals (MCLGs) for these PFAS. The MCLs for PFOA and PFOS are each 4 parts per trillion ("ppt").[6]

**B. Aqueous Film-Forming Foam (AFFF) Contained PFOS and/or PFOA at Relevant Times**

140. Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.

141. Generally, AFFF is used to extinguish fires, particularly fires that involve petroleum or other flammable liquids. AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

142. The AFFF products made by Defendants during the relevant time period contained either or both PFOA and PFOS. AFFF produced, marketed, and/or sold by 3M was the only AFFF produced from fluorochemicals manufactured through electrochemical fluorination ("ECF"), a process that generates PFOS. All other Defendants used telomerization to produce AFFF. Fluorochemicals synthesized through telomerization degrade into PFOA, but not PFOS.

143. When used as the Defendants intended and directed, AFFF causes PFOA, PFOS, and/or other PFAS compounds to enter the body of those handling, using, or otherwise exposed to

---

*PFBS*), Document Number 822-F-22-002, available at  https://nepis.epa.gov/Exe/ZyPURL.cgi?Dockey=P10154ST.txt (last accessed March 11, 2025).

[6] EPA, Per- and *Polyfluoroalkyl Substances (PFAS), Final PFAS National Primary Drinking Water Regulation*, available at https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas (last accessed March 11 2025).

the foam (including firefighters). When using AFFF, firefighters may absorb PFOA and PFOS through their skin, inhale PFOA and PFOS compounds, or inadvertently ingest PFOA and PFOS compounds. Additionally, when used as the Defendants intended and directed, AFFF causes PFOA and PFOS to seep into groundwater, and thus, drinking water supplies in the areas in which it is used. Once in the water supply, PFOA and PFOS can travel long distances from where the AFFF was used. This has resulted in widespread contamination of drinking water supplies with PFOA and PFOS nationwide.

144. Notably, AFFF can be made without PFOA and PFOS. Unlike AFFF made with PFOA or PFOS, fluorine-free foams do not pose a significant health risk to individuals.

145. Despite having knowledge of this fact—as well as having knowledge regarding the toxic nature of AFFF made with PFOA and/or PFOS—Defendants continued to manufacture, distribute and/or sell AFFF with PFOA and/or PFOS, which has ultimately led to Plaintiffs' injuries.

**C. Defendants' Knowledge of PFOA and PFOS Hazards**

146. On information and belief, by the 1970s, Defendants knew, or reasonably should have known, among other things, that: (1) PFOA and PFOS are toxic; and (2) when AFFF is used per the instructions given by the manufacturer, PFOA and PFOS migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

147. At all times pertinent herein, Defendants also knew or should have known that PFOA and PFOS present a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

148. For instance, in 1980, 3M published data in peer reviewed literature showing that humans retain PFOA in their bodies for years. Based on that data, 3M estimated that it could take a

person up to 1.5 years to clear just half of the accumulated PFOA from their body after all exposures had ceased.[7]

149.    By the early 1980s, the industry suspected a correlation between PFOA exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOA in workers' bodies and birth defects in children of workers.

150.    In 1981, DuPont tested for and found PFOA in the blood of female plant workers in Parkersburg, West Virginia. DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[8]

151.    Beginning in 1983, 3M documented a trend of increasing levels of PFOA in the bodies of 3M workers. In an internal memo, 3M's medical officer warned: "[W]e must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[9]

152.    Based on information and belief, in 2000, under pressure from the EPA, 3M announced that it was phasing out PFOS and U.S. production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until 2002.   The company stopped producing PFOA at approximately the same time.

---

[7] *See* Ubel, F.A., Sorenson, S.D., and Roach, D.E., *Health status of plant workers exposed to fluorochemicals - a preliminary report.*  Journal Am. Ind Hyg. Assoc. J 41:584-89 (1980).

[8] *See* DuPont, *C-8 Blood Sampling Results,* available at https://static.ewg.org/files/PFOA_013.pdf?_gl=1*anldwl*_ga*NTgxNzgzMTc3LjE2ODI2ODk5ODk.*_ga_CS21GC4 9KT*MTY4MzU4Nzg2OC4yLjEuMTY4MzU4Nzk0OMC4wLjAuMA..&_ga=2.26293428.885409355.1683587869- 581783177.1682689989 (last accessed March 11, 2025).

[9] *See* 3M, Internal Memorandum, *Organic Fluorine Levels*, (August 31, 1984), Office of Minnesota Attorney General, Exhibit List, No. 1313,-available at https://www.ag.state.mn.us/Office/Cases/3M/StatesExhibits.asp (last accessed March 11, 2025).

26

153. From 1951, DuPont, and on information and belief, Chemours, designed, manufactured, marketed and sold Fluorosurfactant Products, including Teflon nonstick cookware, and more recently PFAS feedstocks such as Forafac 1157 N, for use in the manufacturing of AFFF products.

154. On information and belief, by no later than 2001 Old DuPont manufactured, produced, marketed, and sold Fluorosurfactant Products and/or PFAS feedstocks to some or all of the AFFF product manufacturers for use in their AFFF products that were discharged into the environment and harmed Plaintiffs.

155. DuPont had been studying the potential toxicity of PFOA since at least the 1960s and knew that it was contaminating drinking water drawn from the Ohio River and did not disclose to the public or to government regulators what they knew about the substance's potential effects on humans, animals, or the environment.[10]

156. By December 2005, the EPA uncovered evidence that DuPont concealed the environmental and health effects of PFOA, and the EPA announced the "Largest Environmental Administrative Penalty in Agency History." The EPA fined DuPont $16,500,000 for violating the Toxic Substances Control Act "Section 8(e)—the requirement that companies report to the EPA substantial risk information about chemicals they manufacture, process or distribute in commerce."[11]

157. By July 2011, DuPont could no longer credibly dispute the human toxicity of PFOA, which it continued to manufacture. The "C8 Science Panel" created as part of the settlement of a class action over DuPont's releases from the Washington Works plant had reviewed the available

---

[10] EPA, Consent Agreement and Final Order, *In re E.I. DuPont de Nemours & Co.*, TSCA Docket TSCA-HQ-2004-0016 (Dec. 14, 2005), available at https://www.epa.gov/sites/default/files/documents/dupontpfoasettlement121405.pdf (last accessed March 11, 2025).

[11] *Id.*

scientific evidence and notified DuPont of a "probable link"[12] between PFOA exposure and the

serious (and potentially fatal) conditions of pregnancy-induced hypertension and preeclampsia.[13] By

October 2012, the C8 Science Panel had notified DuPont of a probable link between PFOA and five

other conditions—high cholesterol, kidney cancer, thyroid disease, testicular cancer, and ulcerative

colitis.

158.    In July 2015, DuPont spun off its chemicals division by creating Chemours as a new

publicly traded company, once wholly owned by DuPont. By mid-2015, DuPont had dumped its

perfluorinated chemical liabilities into the lap of the new Chemours.

159.    Defendants also knew or should have known that: (a) users of AFFF would likely

include fire and rescue training organizations and their personnel; (b) fire and rescue personnel were

foreseeable users of AFFF containing or degrading into PFOA and/or PFOS in both training and real-

life fire emergency scenarios; (c) PFOA and PFOS are dangerous to human health when used by fire

and rescue personnel; (d) fire and rescue personnel foreseeably lacked knowledge of these dangers;

and, (e) fire and rescue personnel would require warnings of these dangers and/or affirmative

instructions in the use of AFFF.

160.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1)

designed, manufactured, marketed, purchased, supplied, and/or sold PFOA/PFOS; (2) issued

instructions on how AFFF should be used and disposed of; (3) failed to recall and/or warn the users

of AFFF of the dangers to human health that result from the standard use and disposal of these

---

[12] Under the settlement, "probable link," means that given the available scientific evidence, it is more likely than not that among class members a connection exists between PFOA/C8 exposure and a particular human disease. *See* C8 Panel, *C8 Probable Link Reports*, available at http://www.c8sciencepanel.org/prob_link.html (last accessed March 11, 2025).

[13] *See* C8 Science Panel, Status Report: PFOA (C8) exposure and pregnancy outcome among participants in the C8 Health Project (July 15, 2011), available at http://www.c8sciencepanel.org/pdfs/Status_Report_C8_and_pregnancy_outcome_15July2011.pdf (last accessed March 11, 2025).

products; negligently designed products containing or degrading into PFOA and/or PFOS; and (5) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF containing PFOA and/or PFOS, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFOA/PFOS.

161.     Further, Defendants failed to disclose to environmental regulators and the general public the likely existence of and health risks to the public caused by widespread PFOA and PFOS contamination in drinking water supplies across the country as a result of AFFF usage.

162.     As a direct result of Defendants' acts alleged in this Complaint, Plaintiffs suffered severe health effects caused by exposure to AFFF containing PFOA and/or PFOS.  As a direct and proximate result, Plaintiffs incurred substantial harm, both economic and non-economic.

163.     Defendants had a duty and breached their duty to evaluate and test such products adequately and thoroughly to determine their potential human health impacts before they sold such products. They also had a duty and breached their duty to minimize the risk of harm to human health caused by PFOA and PFOS.

**D.  The Impact of PFOA and PFOS on the Plaintiffs**

164.     Plaintiffs have been significantly and continuously exposed to PFOA and PFOS over many years as a result of Defendants' conduct.

165.     Plaintiffs have been diagnosed with the serious injuries set forth above, including kidney cancer, testicular cancer, thyroid disease, and ulcerative colitis.

166.     Plaintiffs' injuries were caused by Defendants' Fluorosurfactant Products.

167.     The use of Fluorosurfactant Products as directed and intended by the manufacturers caused Plaintiffs' exposure to PFOA and PFOS, which caused Plaintiffs' injuries.

168.     Therefore, as a direct and proximate result of Defendants' tortious conduct as set forth in this complaint, Plaintiffs were damaged in the following ways:

a.      Plaintiffs suffered physical pain and mental anguish;

b.      Plaintiffs incurred hospital, medical, pharmaceutical and other expenses; and

c.      Plaintiffs experienced undue stress related to their diagnoses, medical conditions, and uncertainty about their prognosis.

## FIRST CAUSE OF ACTION

## PRODUCTS LIABILITY- INADEQUATE DESIGN (G.S. § 99B-6)

169.    Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

170.    Plaintiffs were harmed by Fluorosurfactant Products, including AFFF, which was designed, manufactured, sold, and distributed by Defendants, and which was defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

171.    Defendants' Fluorosurfactant Products were defectively designed because, at the time of the products' manufacture, Defendants acted unreasonably in designing or formulating the product, and this conduct was a proximate cause of the Plaintiffs' harm.

172.    In addition, at the time the products left Defendants' control, each Defendant unreasonably failed to adopt a safer, practical, feasible, and otherwise reasonable alternative design or formulation that could then have been reasonably adopted and that would have prevented or substantially reduced the risk of harm without substantially impairing the usefulness, practicality, or desirability of the product.

173.    Moreover, at the time the product left Defendants' control, the design or formulation of the product was so unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of this design.

30

174. The design of Defendants' Fluorosurfactant Products, including AFFF, caused harm to Plaintiffs.

175. The design of Defendants' Fluorosurfactant Products, including AFFF, was a substantial factor in causing harm to Plaintiffs.

176. The gravity of the harm to users and bystanders like Plaintiffs is enormous because the use of and exposure to Defendants' AFFF and Fluorosurfactant Products presents serious health risks, causes personal injuries, and can result in death.

177. The likelihood that this harm would occur was, is, and will be very high because Defendants knew and/or should have known that users of and bystanders exposed to Defendants' Fluorosurfactant Products, including AFFF, would be exposed regularly to toxic compounds that are biopersistent and bioaccumulative.

178. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others, and thus Defendants were grossly negligent.

179. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## SECOND CAUSE OF ACTION
### PRODUCTS LIABILITY- FAILURE TO WARN (G.S. § 99B-5)

180. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

181. Plaintiffs were harmed by Fluorosurfactant Products, including AFFF, that Defendants designed, manufactured, sold, and distributed.

182. Defendants' Fluorosurfactant Products, including AFFF, were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

183. Defendants' Fluorosurfactant Products, including AFFF, were designed, manufactured, sold, and distributed without instructions to prevent exposure and resulting personal injuries.

184. The potential risks of Defendants' Fluorosurfactant Products, including AFFF, were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about their products at the time of design, manufacture, sale, and distribution.

185. The potential human health risks presented an unreasonably dangerous condition when Defendants' Fluorosurfactant Products, including AFFF, were and are used or misused in an intended or reasonably foreseeable way, and Defendants knew that this condition posed a substantial risk of harm to reasonably foreseeable users, bystanders, and the general public including Plaintiffs.

186. The risks of PFAS are not a matter of common knowledge. Ordinary consumers, users, bystanders, and third-parties would not have recognized the potential risks.

187. Defendants failed to adequately warn or instruct of the potential risks of AFFF.

188. Plaintiffs were harmed by exposure to Fluorosurfactant Products, including AFFF; their injuries are a result of exposure to Fluorosurfactant Products, including AFFF; and their damages are a result of their exposure to Fluorosurfactant Products, including AFFF.

189. The lack of sufficient instructions or warnings to users of and those foreseeably exposed to AFFF was a substantial factor in causing Plaintiffs' personal injuries.

190. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others, and thus Defendants were grossly negligent.

191. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## THIRD CAUSE OF ACTION
### NEGLIGENCE

192. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

193. Defendants designed, manufactured, sold, and distributed Fluorosurfactant Products, including AFFF.

194. Defendants' Fluorosurfactant Products, including AFFF, were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

195. Defendants' Fluorosurfactant Products, including AFFF, were designed, manufactured, sold, and distributed without instructions to prevent exposure and resulting personal injuries.

196. Defendants were negligent by not using reasonable care to warn or instruct about the risks associated with Fluorosurfactant Products, including AFFF.

197. Defendants knew or reasonably should have known that their Fluorosurfactant Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

198. Defendants knew or reasonably should have known that users and third parties would not realize the danger.

199. At all times, it was reasonably foreseeable to Defendants that when used as intended, Fluorosurfactant Products, including AFFF, would cause personal injuries.

200. Defendants failed to adequately warn of the danger or instruct on the safe use of Fluorosurfactant Products, including AFFF.

201. A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of Fluorosurfactant Products.

202. Plaintiffs were harmed by exposure to Fluorosurfactant Products, including AFFF; their injuries are a result of exposure to Fluorosurfactant Products, including AFFF; and their damages are a result of their exposure to Fluorosurfactant Products, including AFFF.

203. Defendants' negligence proximately caused Plaintiff's harm.

## FOURTH CAUSE OF ACTION

## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (G.S. § 25-2-314)

204. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

205. At all relevant times, Defendants were in the business of designing, manufacturing, selling, and distributing Fluorosurfactant Products, such as AFFF.

206. Defendants warranted that their Fluorosurfactant Products, including AFFF, are merchantable.

207. Defendants designed, manufactured, sold, and distributed Fluorosurfactant Products, including AFFF, without adequate warning of toxicity, potential human exposure, and potential human health risks associated with intended and instructed use.

208. Defendants' Fluorosurfactant Products were defective or otherwise unmerchantable when they left Defendants' control.

209. When used for the ordinary purposes for which such Fluorosurfactant Products were used and intended, Fluorosurfactant Products, including AFFF, were defective or otherwise unmerchantable because PFAS compounds escaped from those products, causing personal injuries.

210. Defendants breached their implied warranty of merchantability because the goods are not fit for the ordinary purposes for which such goods are used.

211. Defendants breached their implied warranty of merchantability because the Fluorosurfactant Products, including AFFF, were not packaged and labeled with the appropriate warnings about exposure and resulting health risks or with instructions that would have prevented the harm.

212. Defendants became aware of the human health risks and environmental dangers presented by Fluorosurfactant Products by no later than the year 2000.

213. Plaintiffs were harmed by exposure to Fluorosurfactant Products, including AFFF; their injuries is a result of exposure to Fluorosurfactant Products, including AFFF; and their damages are a result of their exposure to Fluorosurfactant Products, including AFFF.

214. Defendants' breach of the implied warranty of merchantability proximately caused Plaintiffs' harm.

215. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and thus Defendants were grossly negligent.

216. Defendants, their officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

35

## FIFTH CAUSE OF ACTION

## CIVIL CONSPIRACY

217.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

218.    At all times relevant to this lawsuit, Defendants actually knew of the hazards that PFOA and PFOS posed to users and bystanders of Fluorosurfactant Products, including Plaintiffs.

219.    Beginning in the 1960s and continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts that caused damage to Plaintiffs. Each Defendant performed at least one overt act in furtherance of this conspiracy. Specifically, Defendants colluded for the avowed purpose of providing information about AFFF products containing PFOA and/or PFOS to the public and the government, with the true, unlawful purpose of: intentionally misrepresenting to the EPA and the public that AFFF containing PFOA and/or PFOS was safe and did not pose a risk to human health and the environment; concealing the dangers of AFFF containing PFOA and/or PFOS, including the products' characteristics; concealing the dangers of PFOA and/or PFOS from users, consumers, governmental agencies, and the public; and using their considerable resources to fight legislation concerning PFOA and PFOS.

220.    As a direct and proximate result of Defendants' conspiracy, Defendants' Flurorsurfactant Products at all times relevant to this litigation have:

a.    posed and continue to pose a threat to firefighters who use AFFF;

b.    posed and continue to pose a threat to bystanders exposed to PFOA and PFOS in their drinking water as a result of AFFF usage;

c.    exposed Plaintiffs to dangerous levels of PFOA and PFOS;

d.    caused personal injuries to Plaintiffs; and

e.    caused Plaintiffs to sustain damages.

36

## SIXTH CAUSE OF ACTION

### FRAUDULENT TRANSFER (DUPONT AND CHEMOURS)

221.    Plaintiffs reallege and reaffirm all allegations set forth in the preceding paragraphs.

222.    Plaintiffs seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act against DuPont.

223.    Upon information and belief, in February 2014, DuPont formed The Chemours Company as a wholly-owned subsidiary, and used it to spin off DuPont's "Performance Chemicals" business line in July 2015.

224.    Upon information and belief, at the time of the spinoff, DuPont's Performance Chemicals division contained the AFFF and/or PFAS business segments. In addition to the transfer of the Performance Chemicals division, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFAS.

225.    Upon information and belief, at the time of the transfer of its Performance Chemicals business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

226.    Upon information and belief, as a result of the transfer of assets and liabilities described in this Complaint, DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from the manufacture and sale of PFAS compounds and products that contain PFAS compounds.

227.    Upon information and belief, DuPont has (a) acted with intent to hinder, delay and defraud parties, or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) was engaged or was about to engage in a business for which the remaining assets of Chemours were unreasonably small in relation to the business; or (ii) intended to incur, or

believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due.

228.    Upon information and belief, DuPont engaged in acts in furtherance of a scheme to transfer its assets out of the reach of parties, such as the Plaintiffs, that have been damaged as a result of DuPont's actions as described in this Complaint.

229.    Upon information and belief, DuPont and Chemours acted without receiving a reasonably equivalent value in exchange for the transfer of obligations, and DuPont believed, or reasonably should have believed, that it would incur debts beyond Chemours' ability to pay as they became due.

230.    Plaintiffs seek to avoid the transfer of DuPont's liabilities for the claims brought in this Complaint and to hold DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

231.    Plaintiffs further reserve such other rights and remedies that may be available to them as may be necessary to fully compensate Plaintiffs for the damages and injuries suffered as alleged in this Complaint.

## PUNITIVE DAMAGES

232.    Under the applicable laws of the State of North Carolina, Plaintiffs seek Punitive damages due to the wanton and willful acts and/or omissions of Defendants as set forth and alleged throughout this Complaint.

## TOLLING OF THE STATUTE OF LIMITATIONS

233.    Plaintiffs hereby incorporate by reference the allegations contained within the preceding paragraphs of this Complaint as if restated in full herein.

## Discovery Rule Tolling

234.     Plaintiffs did not know, nor could they have reasonably discovered by the exercise of reasonable diligence, that exposure to fluorochemical products, including AFFF, PFOA, and PFOS was harmful to human health. The risks of said chemicals and AFFF were not obvious to the users of AFFF, nor were they obvious to individuals such as Plaintiffs in the vicinity of AFFF use. Since Plaintiffs could not have reasonably discovered the defects and risks associated with the use of fluorochemical products, they could not protect themselves from exposure to Defendants' fluorochemical products. For this reason, all applicable statutes of limitations have been tolled by operation of the discovery rule with respect to Plaintiffs' claims.

235.     Plaintiffs had no way of knowing about the risk of serious injury associated with the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF, PFOA, PFOS, and other fluorochemical products is harmful to human health within the time period allowed by any applicable statute of limitations.

236.     Plaintiffs had no way of knowing about the risk of serious injury associated with the use of, and exposure to, AFFF and fluorochemical products until very recently. Further, Plaintiffs could not have discovered, through the exercise of reasonable diligence, that exposure to AFFF is harmful to human health until recently.

237.     During the relevant times, Plaintiffs did not possess specialized scientific or medical knowledge. Plaintiffs did not, and could not, have discovered or known facts that could cause a reasonable person to suspect the risk associated with the use of Defendants' fluorochemical products. Further, a reasonable and diligent investigation by Plaintiffs earlier would not have disclosed that AFFF could cause personal injury.

238.    Wherefore, all applicable statutes of limitations pertaining to Plaintiffs' claims have been tolled by operation of the discovery rule.

## Fraudulent Concealment

239.    Rather than disclose critical safety and health information regarding its AFFF and fluorochemical products, Defendants have consistently and falsely represented the safety of AFFF products.

240.    This fraudulent concealment continues to the present day.

241.    Wherefore, due to Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein through the relevant time for this action, all applicable statutes of limitations have also been tolled.

## Estoppel

242.    Defendants were under a continuous duty to consumers, end users, and other persons, such as Plaintiffs, coming into contact with their fluorochemical products, to provide truthful and reliable safety information concerning their products and the risks associated with their use, as well as exposure to AFFF.

243.    Rather than fulfill this duty, Defendants knowingly, affirmatively, and actively concealed important safety information and warnings concerning AFFF and the health risks associated with the same.

244.    Wherefore, Defendants are estopped from relying on any statute of limitations in defense of this action.

## PRAYER FOR RELIEF

245.    Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

    a.    Compensatory damages according to proof including, but not limited to:

        i.    expenses for care, treatment and hospitalization incident to their injuries;

40

    ii.  compensation for pain and suffering;

    iii.  loss of income;

    iv.  Avoiding the transfer of DuPont's liabilities for the claims brought in this Complaint;

    v.  Punitive damages.

b.  Consequential damages;

c.  Costs, disbursements and attorneys' fees of this lawsuit;

d.  Pre-judgment and post-judgment interest; and

e.  Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs respectfully demand a jury trial pursuant to North Carolina Rule of Civil Procedure 38.

Dated:   June 30, 2025

Respectfully submitted,

*/s/ Brett Land*

**BARON & BUDD, P.C.**
Brett Land (NC Bar No. 60697)
bland@baronbudd.com
Holly Werkema (TX Bar No. 24081202)
*(Pro Hac Vice Forthcoming)*
hwerkema@baronbudd.com
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219-4281
Telephone: (214) 521-3605
Fax: (214) 279-9915

**COSSICH, SUMICH, PARSIOLA**
**& TAYLOR, LLC**
Philip F. Cossich, Jr. (LA Bar No. 1788)
*(Pro Hac Vice Forthcoming)*

41

pcossich@cossichlaw.com
Christina M. Cossich (LA Bar No. 32407)
*(Pro Hac Vice Forthcoming)*
ccossich@cossichlaw.com
8397 Highway 23, Suite 100
Belle Chasse, LA 70037
Telephone: (504) 394-9000

***Attorneys for Plaintiff***